IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RICHARD GLEN STURGEON,           §
TDCJ #880922,                    §
                                 §
            Petitioner,          §
                                 §
v.                               §        CIVIL ACTION NO. H-07-0134
                                 §
NATHANIEL QUARTERMAN, Director,  §
Texas Department of Criminal Justice - §
Correctional Institutions Division, §
                                 §
            Respondent.          §

## MEMORANDUM AND ORDER

State inmate Richard Glen Sturgeon (TDCJ #880922) has filed a petition under 28

U.S.C. § 2254, seeking a federal writ of habeas corpus to challenge a state court conviction

for aggravated robbery.  With the assistance of appointed counsel, Sturgeon has filed an

amended version of his petition.  (Doc. # 56).  Pending before the Court is the respondent's

second motion for summary judgment.  (Doc. # 59).  Sturgeon has filed a reply.  (Doc. # 63).

After considering all of the pleadings, the state court records, and the applicable law, the

Court denies the respondent's motion for summary judgment and grants the amended petition

for a writ of habeas corpus for reasons that follow.

## I.      BACKGROUND AND PROCEDURAL HISTORY

Sturgeon is presently in custody of the Texas Department of Criminal Justice -

Correctional Institutions Division (collectively, "TDCJ") as the result of a judgment of

conviction in state court cause number 812784.  A Harris County grand jury returned an

indictment against Sturgeon in that case, charging him with aggravated robbery with a deadly weapon, namely, a firearm.  The State enhanced that indictment for purposes of punishment with allegations that Sturgeon had at least two prior felony convictions, one for burglary of a motor vehicle and the other for unlawful possession of a firearm by a felon.  Sturgeon's state court proceedings, which featured two trials, two appeals, and several frustrated attempts at state habeas corpus review, are summarized below.

### A.    Sturgeon's First Trial

The aggravated robbery charges against Sturgeon were tried initially in June of 1999, before a jury in the 182nd District Court of Harris County, Texas.  The complaining witness, Minh Nguy, testified that he was robbed at gun point by two black men on December 25, 1998, in the driveway of his Sharpstown-area home on Houston's southwest side.  Nguy, who is an American citizen from Saigon, speaks limited English and testified with the aid of a Vietnamese interpreter.  Nguy explained that, at approximately 1:00 a.m., he arrived home after his shift as a cook at a restaurant owned by a family member.  Nguy stated that two men armed with pistols got out of a nearby parked car and approached him as he sat in his car in the driveway of his home.  Nguy testified that the first man was tall and the second man was short.  Nguy thought that a third man may have remained behind in the parked car, but he was not sure.

According to Nguy, the tall man slowly approached him, pulled him from his car, and pistol-whipped him by striking him repeatedly in the face.  Although it was the middle of the night, Nguy insisted that he had a good opportunity to see his attacker.  The second armed

man, who Nguy admittedly could not see well, struck him from behind and pushed him to the ground.  The robbers took Nguy's wallet, money, and car keys.  One of the robbers then drove off in Nguy's Ford LTD, while the other man left in a separate car.

As a result of the attack, Nguy sustained injuries to his face, including a cut over his left eye and a missing tooth.  Nguy told the officer who responded to the robbery call (Officer Powell) that his primary assailant, the one who pistol-whipped him in the face, was wearing a long black coat with a hat or hood and that he had a facial hair on his chin (a "goatee").  Nguy described his primary assailant as approximately six-feet tall, while the second man who participated in the robbery was around five-foot-seven.  At trial, Nguy identified Sturgeon as the tall robber who struck him in the face with his pistol.

On cross-examination, Sturgeon's defense counsel questioned Nguy at length about his opportunity to observe the robbers and the conditions under which the offense occurred. Nguy admitted that he was tired after working for more than thirteen hours at his family's restaurant and that it was dark when he arrived home from his lengthy shift.  Nguy insisted, however, that both robbers were illuminated by the "security light" outside his home and he was "certain" that Sturgeon was the man who struck him in the face with his pistol.  As Nguy acknowledged in response to defense counsel's questioning, Nguy's initial description to police was not an exact match to Sturgeon and there were some significant inconsistencies in his identification.  In contrast to Nguy's initial description of his assailant as having a goatee or facial hair on his chin, Sturgeon had a full mustache and goatee when he was taken into custody on the day of the offense.  Nguy's initial description to officers made no

mention of a mustache.  Likewise, in contrast to Nguy's description of his assailant as a man who stood at least six-feet tall, Sturgeon is shorter than that by four inches, standing at most five-foot eight.

Officer Michael Monte of the Houston Police Department ("HPD") testified about the circumstances surrounding Sturgeon's arrest.  Officer Monte explained that he encountered Sturgeon while patrolling Houston's north side on the afternoon or early evening of December 25, 1998.  Officer Monte detained a car that belonged to Michael Tobias.  Sturgeon was driving the car.  The passengers included Michael Tobias's brother, Gregory Tobias, as well as two other individuals identified as Elvin Bonner and Alicia Holmes.  Officer Monte found items belonging to Nguy, including a credit card, a social security card, and a driver's license, among other items, in Gregory Tobias's possession.  No items belonging to Nguy were found in Sturgeon's possession.  Bonner, however, was found in possession of a crack pipe and a pistol.  The registration for Nguy's Ford LTD was found in the trunk of the car.  All three men (Sturgeon, Bonner, and Gregory Tobias) were arrested.

After Sturgeon was arrested, he was placed in a line-up along with Gregory Tobias and Bonner on December 26, 1998.[1]  A robbery investigator with HPD, Officer Craig Scallan, conducted the line-up on the day in question.  Officer Scallan testified that Nguy

---

[1]     The video-taped line-up shows that, like Sturgeon, both Elvin Bonner (five-feet seven) and Gregory Tobias (five-feet eight) were substantially shorter than the six-foot-tall assailant described by Nguy.  Both men, however, had a faint goatee.

identified Sturgeon from the line-up as one of the perpetrators of the armed robbery and that

he was certain that Sturgeon was the man who pistol-whipped him during the robbery.[2]

Gregory Tobias ("Tobias"), who was convicted of charges unrelated to the aggravated

robbery,[3] testified for the prosecution at Sturgeon's first trial.[4]  Tobias stated that he picked

up Sturgeon at an apartment complex in Humble at around 7:00 or 7:30 a.m. on the morning

of December 25, 1998, more than six hours after the robbery occurred at around 1:00 a.m.

on December 25, 1998.  Sturgeon and Tobias picked up Elvin Bonner at around 1:00 p.m.

that same afternoon.  Later that afternoon, all three men drove to a location where Nguy's

Ford LTD was parked.  Tobias testified that he saw Sturgeon and Bonner take some items

from the Ford LTD's trunk.  The three were arrested sometime thereafter in the Greenspoint

area on Houston's north side.  Tobias testified that the items belonging to Nguy, which were

found in his possession and recovered by Officer Monte, were given to him by Bonner.

---

[2]      Bonner, Sturgeon, and Tobias were all placed in the same line-up.  Nguy identified Sturgeon
as one of the robbers, but did not identify Bonner — who has admitted taking part in the
robbery — or Tobias — who was in possession of Nguy's personal property at the time of
his arrest — as one of the perpetrators.  Sturgeon challenged his pre-trial identification,
arguing that the police used unduly suggestive procedures.  The trial court overruled
Sturgeon's objection after a hearing on the motion to suppress the identification.  (*Court
Reporter's Record*, June 1999, vol. 3).

[3]      At the second trial, it was disclosed that Tobias had taken the car, which belonged to his
brother, Michael Tobias, on December 24, 1998.  Officer Monte detained the car and its
passengers because Michael Tobias had reported it stolen.  Tobias admitted that he took the
car without permission on December 24, 1998, and that he had "continued partying" until
his arrest on December 25, 1998.  As a result of his arrest, Tobias was convicted of
unauthorized use of a motor vehicle in February of 1999, and sentenced to eight months in
a state jail facility.

[4]      Hereafter, the Court refers to Gregory Tobias as "Tobias" and uses "Michael Tobias" to refer
to that individual.

Tobias stated, however, that he had no information about whether Sturgeon or Bonner committed any armed robbery.

Other police officers testified that they found Nguy's Ford LTD and were able to recover latent fingerprints from the car's interior.  None of the fingerprints found in the car, however, were a match to Sturgeon, Bonner, or Tobias.   Thus, other than Nguy's identification, there was no direct evidence linking Sturgeon to the offense.

Sturgeon did not testify in his own defense, but he planned to call at least two witnesses who would have placed him on the other side of Houston at or around the time that the robbery occurred outside of Nguy's Sharpstown-area home.  Two of these witnesses had appeared at a prior court setting, but they did not appear on the day that the defense was ready to present its case.  Defense counsel attempted to secure their attendance, but the trial court refused to issue writs of attachment.  According to the bill of exceptions made by trial counsel, the witnesses would have testified that Sturgeon was in Humble, Texas, where he was residing at the time, which is thirty miles or more from the location of the robbery at Nguy's home in Sharpstown, at the time of the offense.

Defense counsel rested without putting on any witnesses.  Citing the inconsistencies between Nguy's initial description of his assailant and Sturgeon's actual characteristics at the time of the offense, defense counsel argued that Sturgeon was not the perpetrator and that Nguy's identification was mistaken.  The jury rejected Sturgeon's defense of mistaken identification and found him guilty as charged.  The same jury sentenced Sturgeon to serve fifty years in prison.

On direct appeal, Sturgeon argued that the trial court erred by failing to issue writs of attachment to procure the attendance of his alibi witnesses at trial.  The intermediate court of appeals found that Sturgeon's trial attorney failed to preserve error, but the Texas Court of Criminal Appeals reversed the conviction on this ground and remanded Sturgeon's case for a new trial.  *See Sturgeon v. State*, 106 S.W.3d 81 (Tex. Crim. App. 2003).

### B.    Sturgeon's Second Trial

Sturgeon's second trial commenced on March 22, 2004.  At a pretrial proceeding held shortly before jury selection, the trial court inquired whether there had been any plea bargain discussions.  Sturgeon insisted that he was not guilty and that he was not interested in any kind of plea bargain.

The second trial proceeded much as the first and the State presented essentially the same evidence.  Nguy once again identified Sturgeon as the man who struck him in the face with a pistol and robbed him during the early morning hours of December 25, 1998.  The police officers gave similar testimony about Sturgeon's arrest in the company of Elvin Bonner and Tobias, who had Nguy's credit card and personal identification documents in his pocket.

Tobias, who testified for the State at Sturgeon's second trial, offered a slightly different version of events than the one he offered at the first proceeding.  During his testimony at the second trial, Tobias elaborated that, at the time of his arrest on December 25, 1998, Sturgeon was driving the car that belonged to Michael Tobias because Tobias was under the influence of crack cocaine.  Citing his intoxication, Tobias stated that he could not

remember whether both Sturgeon and Bonner removed items from the trunk of Nguy's Ford LTD. Tobias was certain, however, that Bonner had removed the items belonging to Nguy from the Ford LTD and that Bonner had given the credit card and other documents to him.

After the State rested its case, Sturgeon attempted to call Dr. Steven M. Smith, a professor of cognitive psychology at Texas A&M University, as an expert witness to testify about the questionable reliability of eyewitness identifications. Outside of the jury's presence, the trial court held a hearing during which Dr. Smith testified at length about the relevant scientific studies on eyewitness identification and his many publications, including one used by the National Institute of Justice to train law enforcement in the proper way to evaluate eyewitness identifications.[5] The trial court refused to allow Dr. Smith's testimony, however, because he was unfamiliar with the precise facts of the case against Sturgeon and because he provided insufficient information about the scientific studies on which he purported to rely.

Sturgeon also attempted to call Elvin Bonner as a witness at his second trial. Bonner had been indicted for the December 25, 1998 aggravated robbery as well, but those charges were dismissed on June 29, 1999, shortly after Sturgeon's first trial ended, when Bonner

---

[5] The trial court held a "gatekeeping hearing" to determine the scientific reliability and validity of the scientific methodology on which Dr. Smith proposed to testify. These hearings are known as *Daubert/Kelly* hearings in Texas. *See Hernandez v. State*, 116 S.W.3d 26, 29-30 (Tex. Crim. App. 2003) (discussing the admissibility of scientific evidence and the "*Daubert/Kelly*" gatekeeping procedure); *see also* TEX. R. EVID. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); and *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992).

agreed to enter a guilty plea to other charges.[6]  Bonner reportedly would have acknowledged that he participated in the robbery of Minh Nguy, that he did not meet Sturgeon until after the offense occurred, and that Sturgeon did not commit the robbery.  At some time prior to the trial, the presiding judge appointed counsel (Ted Doebbler) to represent Bonner for purposes of his appearance as a witness at Sturgeon's trial.  Although the aggravated robbery charges against Bonner arising from the robbery of Nguy had been dismissed previously pursuant to a plea bargain agreement in another case, the prosecutor advised the trial court that the dismissal had been entered without prejudice to refiling.  Because this procedural posture meant that the aggravated robbery charges could be re-filed against Bonner if he made any inculpatory remarks, Bonner elected to invoke the privilege against self-incrimination under the Fifth Amendment and did not testify.

Sturgeon presented testimony from two witnesses in an attempt to establish an alibi for the time that the offense occurred on the southwest side of Houston during the early morning hours of December 25, 1998.  Sturgeon presented evidence from a cousin, Demetrius Horton, who told the jury that he and Sturgeon were doing some last-minute Christmas shopping on the evening of December 24, 1998.  Horton testified that the two were at Toys-R-Us at around 9:00 p.m., where they shopped for at least thirty-five minutes.

---

[6]      Records provided by Sturgeon reflect that Bonner pleaded guilty to charges that, on December 25, 1998, he was found in possession of a firearm after having been convicted previously of a felony.  Bonner was sentenced to thirty years in prison as a result of his guilty plea to these charges.  (Doc. # 56, Exhibit, Judicial Confession in Cause No. 810223).

Horton testified that he last saw Sturgeon at his residence in Humble, on Houston's north side of town, at around 10:00 p.m. that evening.

Sturgeon also presented testimony from Di Anita Manning, who testified that she was involved in a romantic relationship with Sturgeon during the time at issue. Manning testified that she spoke to Sturgeon at least twice by telephone during the early morning hours of December 25, 1998, at or around the time the aggravated robbery occurred. Manning testified that, during these conversations, she was at her home and that Sturgeon was at his residence in Humble.

Referencing the inconsistencies in Nguy's identification and the alibi testimony from Horton and Manning, defense counsel argued that Sturgeon was innocent. On March 25, 2004, the jury found Sturgeon guilty of aggravated robbery as charged in the indictment. Sturgeon testified during the punishment phase of the trial and denied committing the robbery. The jury sentenced him to serve twenty-five years in prison.

During his second direct appeal, Sturgeon argued that the trial court erred by excluding Dr. Smith's expert testimony about the questionable reliability of eyewitness identifications. Citing Dr. Smith's unfamiliarity with the facts of the case, however, and his failure to provide sufficient information about the scientific studies on which he based his proposed testimony, the intermediate court of appeals upheld the trial court's decision to exclude his testimony and affirmed the conviction. *See Sturgeon v. State*, No. 14-04-00311-CR, 2005 WL 2420423 (Tex. App. — Houston Aug. 23, 2005). After Sturgeon filed an unsuccessful *pro se* motion for rehearing with the intermediate court of appeals, the Texas

10

Court of Criminal Appeals dismissed his *pro se* petition for discretionary review on January 6, 2006, as untimely filed.

### C.    Sturgeon's State Habeas Corpus Proceedings

Sturgeon attempted to challenge his conviction further by filing a state application for a writ of habeas corpus under Article 11.07 of the Texas Code of Criminal Procedure on July 14, 2006. *See Ex parte Sturgeon*, No. 812784-A. In that application, Sturgeon insisted that he was actually innocent. In support of this claim, Sturgeon presented an affidavit from Elvin Bonner. That affidavit, which is discussed in more detail below, essentially stated that Bonner participated in the robbery of Minh Nguy, that he did not meet Sturgeon until after the offense occurred, and that Sturgeon is actually innocent. Bonner also disclosed that he was prevented from testifying on Sturgeon's behalf at the trial because, even though the aggravated robbery charges against him had been dismissed previously, he was threatened with additional prosecution. Sturgeon complained that the prosecutor violated due process by discouraging Bonner from testifying and that the trial court violated due process by admitting evidence of his pre-trial identification, which was based on impermissibly suggestive procedures. Sturgeon also argued that he was denied effective assistance of counsel at trial. In particular, Sturgeon complained that his attorney failed to request DNA testing on evidence containing biological material and that his attorney failed to properly present expert testimony from Dr. Smith on the issue of eyewitness identification.

The trial court did not consider the merits of Sturgeon's state habeas application or the evidence in support of his actual-innocence claim. The State, in its answer, argued that

11

the application should be dismissed because Sturgeon failed to comply with the form prescribed by Rule 73.1 of the Texas Rules of Appellate Procedure.  The trial court agreed and adopted the State's proposed findings on August 4, 2006, recommending that the application be dismissed for Sturgeon's failure to comply with the applicable rules of procedure.  *See Ex parte Sturgeon*, No. 812784-A.  Shortly thereafter, on August 23, 2006, the Texas Court of Criminal Appeals summarily dismissed Sturgeon's application for his failure to comply with procedural rules.  *See Ex parte Sturgeon*, No. 65,483-01.

After he received the trial court's August 4, 2006 recommendation, but before the Texas Court of Criminal Appeals issued its summary dismissal on August 23, 2006, Sturgeon filed an "amended" habeas corpus application on August 21, 2006, in an effort to cure the deficiency identified by the State in its answer to his original application.  As noted previously, the amended application was not assigned a cause number and was never forwarded to the trial court for its consideration in compliance with Article 11.07 of the Texas Code of Criminal Procedure.  (Doc. # 30, *Memorandum and Order*, at 8-11).  Instead, the amended application was treated as a "supplement" to the original application (No. 812784-A) and forwarded directly to the Texas Court of Criminal Appeals on August 23, 2006, which is the same day that Sturgeon's original application (No. 812784-A) was dismissed for failure to comply with Rule 73.1 of the Texas Rules of Appellate Procedure. *See Ex parte Sturgeon*, No. 65,483-01 Supplemental Clerk's Record.

On November 28, 2006, Sturgeon filed a separate action seeking a writ of mandamus to compel the Harris County Clerk's Office to process his amended application in accordance

with Article 11.07 of the Texas Code of Criminal Procedure by assigning it a cause number and forwarding it to the trial court for consideration.  On December 20, 2006, the Texas Court of Criminal Appeals denied Sturgeon's motion for leave to file a writ of mandamus. *See Ex parte Sturgeon*, No. 65,483-02 (December 20, 2006).  That same day, the Texas Court of Criminal Appeals summarily denied the amended application without a written order.  *See Ex parte Sturgeon*, No. 65,483-03 (December 20, 2006).

The record of this proceeding accordingly shows that there was no answer from the State, no affidavits provided by defense counsel or the prosecutor, and no findings, conclusions, or recommendation by the trial court in its state habeas corpus capacity.  *See id*. In other words, there was no attempt to identify or resolve any of the obvious fact issues presented in Sturgeon's habeas application, with his claims of actual innocence, denial of due process, and denial of the right to effective assistance of counsel.

### D.    Sturgeon's Federal Habeas Corpus Proceedings

After his amended state habeas corpus application was summarily rejected, Sturgeon filed this federal proceeding to challenge his aggravated robbery conviction under 28 U.S.C. § 2254.  In that petition, Sturgeon raised essentially the same claims that he attempted to present in state court. (Docs. # 1 & # 2, *Petition* and *Memorandum in Support*).  In answer to the petition, the respondent filed a motion for summary judgment, arguing that Sturgeon's claims were either unexhausted and procedurally barred or that he was not otherwise entitled to relief under the federal habeas standard of review set forth in the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), 28 U.S.C. § 2254(d).  Sturgeon filed a reply,

13

noting that the trial court never truly adjudicated his claims on the merits contemplated by Article 11.07 of the Texas Code of Criminal Procedure because the issues presented in his amended habeas application were never resolved. This Court denied the respondent's motion for summary judgment and stayed the case to afford Sturgeon an opportunity to return to state court with the hopes that he might obtain proper consideration under Article 11.07. (Docs. # 30, # 33). This did not happen.

Consistent with this Court's order, Sturgeon filed another habeas corpus application in state court, presenting his claims of actual innocence, and the affidavit from Elvin Bonner, along with his claims for the denial of due process and the right to effective assistance of counsel. *See Ex parte Sturgeon*, No. 812784-B. With no review of the merits or any attempt to resolve the fact issues raised by the application, the trial court summarily rejected Sturgeon's claims. The trial court adopted the State's proposed findings and recommended that Sturgeon's habeas corpus application be dismissed as an abuse of the writ under Article 11.07, § 4 of the Texas Code of Criminal Procedure because he failed to demonstrate that his claims could not have been presented previously in his first application. The Texas Court of Criminal Appeals agreed and summarily dismissed the application. *See Ex parte Sturgeon*, No. 65,483-04 (May 7, 2008).

Subsequently, this Court reinstated Sturgeon's case, appointed counsel, and authorized discovery. (Docs. # 37, # 45). In his amended petition, Sturgeon maintains that he is actually innocent and he that he was prevented from presenting this evidence at trial because his counsel was constitutionally deficient and the prosecutor violated his right to due process

14

by threatening to re-file charges against Bonner.  Sturgeon contends further that his attorney was deficient for failing to present expert testimony regarding the fallibility of eyewitness identifications and that the trial court violated his right to due process by admitting evidence of his pretrial identification, which was obtained through unduly suggestive means.

The respondent has now filed a second motion for summary judgment, repeating the same argument that Sturgeon is not entitled to relief because his claims are either procedurally barred or without merit under the deferential AEDPA standard of review.  (Doc. # 59).  Sturgeon argues that he is entitled to relief under *de novo* review and, if necessary, he requests an evidentiary hearing to resolve any lingering fact issues.  (Doc. # 63).  The parties' contentions are discussed below under the applicable standard of review.

## II.     STANDARD OF REVIEW

Federal review of habeas corpus petitions filed after April 24, 1996, is subject to provisions of the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996).  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997) (holding that the AEDPA applies to those habeas corpus petitions filed after its effective date of April 24, 1996).  "[The] AEDPA was enacted, at least in part, to ensure comity, finality, and deference to state court determinations by limiting the scope of collateral review and raising the standard for federal habeas relief."  *Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003) (citations omitted).  As the Supreme Court has explained, the federal habeas corpus statutes amended by the AEDPA, codified at 28 U.S.C. § 2254(d), establish a "highly deferential standard for evaluating state-court rulings, . . . , which demands that state court decisions be

15

given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (internal citation omitted). Thus, the AEDPA has "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

For claims adjudicated on the merits in state court, the AEDPA provides that a petitioner is not entitled to relief unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 404-08 (2000); *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir. 2009). A state court unreasonably applies clearly established precedent if it identifies the correct governing legal principle but unreasonably applies that principle to the facts of the case. *See Brown v. Payton*, 544 U.S. 133, 141 (2005). Under this standard, an "unreasonable" application must be more than merely incorrect or erroneous; rather, the state court's application of clearly established law must be "objectively unreasonable." *Williams*, 529 U.S. at 409. The focus of this objective reasonableness inquiry is on the state court's ultimate decision, not whether the state court "discussed every angle of the evidence." *Dale v. Quarterman*, 553 F.3d 876, 879 (5th Cir. 2008) (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc)).

A federal habeas corpus court's inquiry under § 2254(d)(1) is not altered where the state court denies relief without a written opinion. *See Schaetzle v. Cockrell*, 343 F.3d 440, 443 (5th Cir. 2003). For such a situation, a reviewing court (1) assumes that the state court applied the proper "clearly established Federal law"; and (2) then determines whether its decision was "contrary to" or "an objectively unreasonable application of" that law. *Id.* (citing *Catalan v. Cockrell*, 315 F.3d 491, 493 & n.3 (5th Cir. 2002)).

Where pure questions of fact are concerned, a state court's findings and conclusions are entitled to deference unless they are "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2); *Buntion v. Quarterman*, 524 F.3d 664, 670 (5th Cir. 2008), *cert. denied*, — U.S. —, 129 S. Ct. 1306 (2009). A state court's findings of fact are presumed to be correct on federal habeas review, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This presumption extends not only to express findings of fact, but to the implicit findings of the state court as well. *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (citing *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005); *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004)).

As this deferential standard reflects, the AEDPA scheme recognizes that federal habeas corpus petitioners are required to first present their claims in state court and to exhaust all state court remedies through proper adjudication. *See* 28 U.S.C. § 2254(b). "To satisfy the exhaustion requirement, the petitioner must fairly present the substance of his federal claim to the highest state court." *Ries v. Quarterman*, 522 F.3d 517, 523 (5th Cir.

2008).  If the petitioner's claims have been adjudicated on the merits in state court, and not dismissed for procedural reasons, the AEDPA applies.  *Valdez v. Cockrell*, 274 F.3d 941, 946-48 (5th Cir. 2001); *see also Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999) (concluding that when a state habeas corpus court rejects a petitioner's claim on procedural grounds, there has not been an "adjudication on the merits" as contemplated by the AEDPA).  If a claim has not been adjudicated on the merits in state court, federal review may be barred by the doctrine of procedural default if the petitioner has failed to meet state procedural requirements for presenting his federal claims, thereby depriving the state courts of an opportunity to address those claims in the first instance.  *See Cone v. Bell*, — U.S. —, — S. Ct. —, 2009 WL 1118709, *9 (2009) (noting that, "[w]hen a petitioner fails to properly raise his federal claims in state court, he deprives the State of 'an opportunity to address those claims in the first instance' and frustrates the State's ability to honor his constitutional rights") (quoting *Coleman v. Thompson*, 501 U.S. 722, 732 (1991)).  The petitioner's claims for relief are examined below under the applicable legal standard.

## III.  DISCUSSION

As noted above, Sturgeon presents several related grounds for relief in his amended petition.  (Doc. # 56).  Sturgeon's primary contention is that he is actually innocent, but that he was denied the opportunity to present exculpatory evidence in violation of his constitutional rights.  In particular, Sturgeon complains that Elvin Bonner would have provided exculpatory evidence of Sturgeon's actual innocence, but that Bonner invoked his rights under the Fifth Amendment and declined to testify at trial after he was wrongly

threatened with criminal prosecution.  Acknowledging that the State's case against him was based mainly on the testimony of the complaining witness, who identified him at trial, Sturgeon insists that he was mistakenly identified.  Sturgeon claims that he attempted to present expert testimony from Dr. Smith about the questionable reliability of eyewitness identifications, but that Dr. Smith's testimony was excluded because he was not properly prepared or provided with sufficient information to testify about the facts of Sturgeon's case. Sturgeon complains further that his pretrial identification was obtained with police procedures that were impermissibly suggestive and that the victim's identification was not reliable.  These claims are addressed below, beginning with Sturgeon's claim that his counsel failed to raise valid objections after Elvin Bonner invoked the Fifth Amendment privilege against self-incrimination.

### A.  Ineffective Assistance of Counsel – Failure to Raise Valid Objections

In his first ground for review, Sturgeon contends that he is entitled to relief from his conviction because he was denied effective assistance of counsel at his second trial in violation of the Sixth Amendment to the United States Constitution.  Sturgeon was represented at his second trial by court-appointed counsel, Ms. Johna Stallings.  Sturgeon contends that Stallings was deficient because, after Bonner was threatened with criminal prosecution if he testified, she failed to object or challenge Elvin Bonner's decision to invoke the Fifth Amendment privilege against self-incrimination.  As noted previously, Bonner has provided an affidavit, which states that he wanted to testify on Sturgeon's behalf and would have told the jury that Sturgeon did not commit the robbery.  Sturgeon contends that his

counsel failed to raise two valid objections that would have allowed Bonner to testify without fear of further criminal prosecution. Thus, Sturgeon maintains that, but for his counsel's failure to raise the appropriate objection at trial, he was unable to present evidence of his actual innocence at his trial.

The respondent does not dispute the merits of Sturgeon's ineffective-assistance claim concerning his attorney's failure to object. Instead, the respondent notes that Sturgeon did not raise this precise claim on state habeas corpus review. Arguing that this claim is unexhausted, and that a subsequent state habeas application would be dismissed as an abuse of the writ under Texas law, the respondent maintains that this claim is procedurally defaulted and barred from federal habeas corpus review. Before addressing Sturgeon's claim, the Court pauses to consider the doctrine of procedural default and its applicability in this case.

## 1.     The Doctrine of Procedural Default

The Supreme Court has emphasized that, under the doctrine of procedural default, "federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" *Cone v. Bell*, — U.S.—, 2009 WL 1118709, *9 (2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *Lee v. Kemna*, 534 U.S. 362, 375 (2002)). In the context of federal habeas proceedings, the independent-and-adequate-state-ground doctrine is designed to "ensur[e] that the States' interest in correcting their own mistakes is respected in all federal habeas cases." *Cone*, —

20

U.S.—, 2009 WL 1118709, *9 (quoting *Coleman*, 501 U.S. at 732). "Therefore, consistent with the longstanding requirement that habeas petitioners must exhaust available state remedies before seeking relief in federal court," the Supreme Court has held that, "when a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review." *Cone*, — U.S.—, 2009 WL 1118709, *9 (quoting *Coleman*, 501 U.S. at 731).

Sturgeon concedes that he did not present a claim concerning his defense counsel's failure to object and that this allegation is unexhausted. Because a Texas court would likely find that his claim is procedurally barred by the state law prohibiting abuse of the writ, Sturgeon acknowledges further that his failure to exhaust state court remedies constitutes a procedural default in this instance. *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001) ("If a petitioner fails to exhaust state remedies, but the court to which he would be required to return to meet the exhaustion requirement would now find the claim procedurally barred, then there has been a procedural default for purposes of federal habeas corpus relief."); *see also Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008) ("[The Fifth Circuit] has held that, since 1994, the Texas [abuse-of-the-writ] doctrine has been consistently applied as a procedural bar, and that it is an independent and adequate state ground for the purpose of imposing a procedural bar.")(citations omitted).

There are exceptions to the doctrine of procedural default which, if satisfied, will allow a petitioner to overcome his default and obtain federal habeas corpus review of his

claims. Where a petitioner has defaulted his federal claims, federal habeas review is available if he can demonstrate (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law," or (2) that "failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008). In this instance, Sturgeon points to Bonner's testimony as evidence of actual innocence that he was unable to present at trial. Sturgeon argues that, because he is actually innocent, a fundamental miscarriage of justice would result if his claims were procedurally barred from federal review.

Ordinarily, claims of actual innocence are not cognizable on federal habeas corpus review and do not state a ground for relief "absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). Thus, the claim of innocence is not itself a constitutional claim on federal habeas review, but acts instead as "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Schlup v. Delo*, 513 U.S. 298, 861 (1995) (citing *Herrera v. Collins*, 506 U.S. 390, 404 (1993)); *see also House v. Bell*, 547 U.S. 518, 537 (2006) (emphasizing that, under the rule announced in *Schlup*, prisoners may assert actual innocence as a "gateway to [review of] defaulted claims"). In other words, where a petitioner can make a persuasive showing that he is actually innocent, then he may fit within the fundamental-miscarriage-of-justice exception to the doctrine of procedural default. *See Murray v. Carrier*, 477 U.S. 478 (1986) (recognizing a narrow exception to the cause-and-prejudice requirement where a

22

constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense).

To fit within the fundamental-miscarriage-of-justice exception, the petitioner must show that, as a factual matter, "he did not commit the crime of conviction." *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999) (citations omitted).  To establish the requisite probability that he is actually innocent, the petitioner must support his allegations with new, reliable evidence that was not presented at trial and must show that it was "more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 513 U.S. at 327. Examples of new, reliable evidence that may establish factual innocence include exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain physical evidence.  *See id*. at 324.

Here, Sturgeon provides a sworn affidavit and deposition testimony from Bonner, who admits that he participated in the aggravated robbery of Minh Nguy, that he did not meet Sturgeon until well after the offense occurred, that Sturgeon did not participate in the offense, and that Sturgeon is actually innocent.  The record reflects that Sturgeon has maintained his innocence throughout his state court proceedings.  Accordingly, the exculpatory evidence provided by Bonner, when considered along with the defenses of alibi and mistaken identification presented by Sturgeon at his trial, "raise[s] sufficient doubt about [Sturgeon's] guilt to undermine confidence in the result of the trial without the assurance that [his] trial was untainted by constitutional error[.]"  *Schlup*, 513 U.S. at 317.  The Court concludes, therefore, that Sturgeon has satisfied the fundamental-miscarriage-of-justice exception and

that "a review of the merits of [his] constitutional claims" is warranted.  *Id.*  Sturgeon's claim

concerning his counsel's failure to object is subject to *de novo* review under the legal

standard that governs allegations of ineffective assistance of counsel under the Sixth

Amendment, rather than under the deferential standard provided by the AEDPA.

### 2.   Legal Standard for Ineffective Assistance of Counsel

The Supreme Court has recognized that the Sixth Amendment guarantees criminal

defendants the effective assistance of counsel at trial.  *See Yarborough v. Gentry*, 540 U.S.

1, 5 (2003).  Claims for ineffective assistance of counsel are analyzed under the well

established standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail

under the *Strickland* standard, a defendant must demonstrate both constitutionally deficient

performance by counsel and actual prejudice as a result of the alleged deficiency.  *See*

*Williams v. Taylor*, 529 U.S. 390, 390-91 (2000).  "Unless a defendant makes both showings,

it cannot be said that the conviction . . . resulted from a breakdown in the adversary process

that rendered the result unreliable."  *Strickland*, 466 U.S. at 687.

To demonstrate deficient performance on his counsel's part, a petitioner must show

that "counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed the defendant by the Sixth Amendment."  *Strickland*, 466 U.S. at 687.  "The

proper measure of attorney performance remains simply reasonableness under prevailing

professional norms."  *Id*. at 688.  "Judicial scrutiny of counsel's performance must be highly

deferential," and "a court must indulge a strong presumption that counsel's conduct falls

within the wide range of reasonable professional assistance."  *Id*. at 689.  That is, the

defendant must overcome the presumption that, under the circumstances, "the challenged action might be considered sound trial strategy." *Riley v. Dretke*, 362 F.3d 302, 305 (5th Cir. 2004).

Deficient performance, standing alone, is not sufficient to prevail under *Strickland*. Once a petitioner establishes error by his defense counsel, then he must still demonstrate actual prejudice as a result of his counsel's deficient performance. Performance is prejudicial only if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" in this context is "a probability sufficient to undermine confidence in the outcome." *Id*.

Here, Sturgeon complains that his counsel was deficient for failing to raise an objection when Elvin Bonner invoked the Fifth Amendment privilege against self-incrimination and declined to testify for fear of facing additional criminal prosecution. As explained previously in the chronology of Sturgeon's second trial in March of 2004, Bonner had been charged in a separate indictment with committing the same aggravated robbery that occurred on December 25, 1998. The aggravated robbery charges against Bonner were dismissed on June 29, 1999, pursuant to an informal plea bargain agreement.[7] According to

---

[7]     Other than the information provided in Bonner's judicial confession, the precise terms of the plea agreement were not reduced to writing. (Doc. # 56, Exhibit, Judicial Confession in Cause No. 801223). The written judicial confession, which is recorded on a pre-printed form typically used by the state district courts in Harris County, simply states that, in return for a plea of guilty to charges that Bonner unlawfully possessed a firearm on December 25, 1998, the prosecutor would recommend punishment of thirty-years' imprisonment. (*Id.*). As discussed further below, it was apparently understood that the aggravated robbery
(continued...)

that agreement, the State dismissed the aggravated robbery charges and Bonner accepted a thirty-year prison sentence in exchange for his guilty plea in a separate case accusing him of unlawful possession of a firearm by a previously convicted felon.  (Doc. # 56, Exhibit).  The substance of Bonner's proposed testimony is outlined below.

In his affidavit to the state habeas corpus court, Bonner acknowledged that he participated in the aggravated robbery of Minh Nguy during the early morning hours of December 25, 1998.[8]  Bonner reported that he was introduced to Sturgeon for the first time during the afternoon of December 25, 1998, after the robbery took place.  Bonner insisted that Sturgeon is innocent of the offense.  Bonner explained that he would have testified at Sturgeon's trial, but that his attorney told him that he would be charged with the aggravated robbery if he gave any favorable testimony on Sturgeon's behalf.  Bonner reportedly invoked his rights under the Fifth Amendment because the prosecutor stated that he would be prosecuted if he testified for Sturgeon at the trial.

Bonner repeated the substance of these allegations at a recent deposition in this case. (Doc. # 57, *Bonner Deposition*).  In that deposition, Bonner admitted that he participated in the aggravated robbery of Minh Nguy that occurred early in the morning of December 25,

---

[7](...continued)
charges that had been lodged against Bonner in connection with the December 25, 1998 robbery of Minh Nguy would be dismissed as well in return for the guilty plea and that the dismissal would be "with prejudice."  (Doc. # 56, Exhibit, Affidavit of Donald Catlett).

[8]     Bonner's affidavit, which is dated July 26, 2005, is attached to each of the habeas corpus applications submitted by Sturgeon in state court.  *See Ex parte Sturgeon*, No. 65,483-01 at 36-67; *Ex parte Sturgeon*, No. 65,483-03 at 35-36; and *Ex parte Sturgeon*, No. 65,483-04 at 59-60.  The affidavit is also attached as an exhibit to the original habeas corpus petition filed by Sturgeon in this federal proceeding.  (Doc. # 1, Exhibit).

1998, and that he is the one who drove Nguy's car away from the house following that incident. (*Id.* at 11-14). Bonner stated that he was introduced Sturgeon for the first time on the afternoon of December 25, 1998, many hours after the robbery occurred. (*Id.* at 11, 27). Bonner insisted that Sturgeon had nothing to do with the robbery and that he is "not guilty" in any way. (*Id.* at 11). Bonner explained further that he wanted to testify at Sturgeon's second trial in March of 2004, but that he invoked his rights under the Fifth Amendment on the advice of his appointed counsel, Ted Doebbler, who told him that the prosecutor intended to re-file the aggravated robbery charges against him if he testified on Sturgeon's behalf. (*Id.* at 17-18, 23).

Deposition testimony from Sturgeon's counsel confirms that, even though the aggravated robbery charges against Bonner had been dismissed after his guilty plea on June 29, 1999, the prosecutor was threatening to re-file those charges against Bonner if he testified on Sturgeon's behalf. (Doc. # 62, *Stallings Deposition*, at 12-14). In addition, the trial record supports Sturgeon's claim that Bonner was prevented from testifying on Sturgeon's behalf because he believed that the prosecutor intended to re-file aggravated robbery charges against him if he admitted any part of his involvement in the December 25, 1998 offense. The trial court held a brief hearing outside of the jury's presence to determine whether Bonner would testify. During this hearing, the prosecutor represented to the trial court that the dismissal of the aggravated robbery charges against Bonner had been without prejudice, meaning that Bonner could face prosecution if he gave any incriminating testimony on Sturgeon's behalf:

| COURT: | Would you state your name for the record. |
|---|---|
| BONNER: | Elvin Adrian Bonner. |
| COURT: | Mr. Bonner, it's my understanding that the Defense had every desire or wanted to call you as a witness in this particular case, which is the State of Texas versus Richard Sturgeon.  Is that correct, Ms. Stallings? |
| STALLINGS: | Yes, Your Honor. |
| COURT: | And in an abundance of caution, we – it appeared that there might be some, potentially some criminal responsibility on your part out of this transaction.  And I went ahead and appointed Mr. Doebbler to advise you and talk to you about whether or not he believes you have any type of criminal exposure, if so, if you wanted to exercise your Fifth Amendment right. |
| PROSECUTOR: | That's correct, Your Honor. |
| COURT: | [The aggravated robbery indictment] was dismissed, but not dismissed with prejudice. |
| PROSECUTOR: | *That's our understanding, correct.* |

(*Court Reporter's Record*, March 2004, vol. 6, at 190-91) (emphasis added).    After the

prosecutor confirmed that Bonner's aggravated robbery charges had been dismissed without

prejudice following his guilty plea, implying that criminal charges could be and would be re-

filed against him if he gave any inculpatory testimony, the record shows that Bonner invoked

his rights under the Fifth Amendment and did not testify on Sturgeon's behalf.  (*Id.* at 192).

It is undisputed that Sturgeon's defense counsel did not raise any objection to

Bonner's decision to invoke the Fifth Amendment privilege against self-incrimination and

that she made no other effort to clarify whether the privilege applied.  Sturgeon contends that

this was deficient because his counsel had at least two valid objections to raise, which, if presented, would have demonstrated that it was unnecessary for Bonner to invoke his Fifth Amendment rights.  Each of these objections are discussed briefly below.

### a.    The Statute of Limitations for Prosecution had Expired

Sturgeon notes that the aggravated robbery at issue occurred on December 25, 1998, and that his second trial commenced more than five years later on March 22, 2004.  Sturgeon maintains that, when Bonner invoked the Fifth Amendment privilege against self-incrimination and declined to testify about the aggravated robbery incident, Ms. Stallings should have objected that the applicable five-year statute of limitations on the aggravated robbery charges had run.  *See* TEX. PEN. CODE § 29.03(b).  The prosecutor at Sturgeon's second trial, Ms. Neelu Sachdeva, acknowledged in her deposition that the statute of limitations had run on the aggravated robbery charges against Bonner by the time Bonner appeared in court to testify as a witness at Sturgeon's second trial in late March of 2004.[9] (Doc. # 61, *Sachdeva Deposition*, at 16).  Therefore, the State could not have re-filed the charges against Bonner because the statute of limitations had run.

---

[9]    The respondent has not addressed Sturgeon's argument that the aggravated robbery charges against Bonner were barred by limitations by the time of the second trial.  Even if they were not barred, Sturgeon argues in the alternative that Ms. Stallings still deficiently failed to secure Bonner's testimony.  Bonner was indicted for the December 25, 1998 aggravated robbery on January 29, 1999, and those charges were dismissed five months later on June 29, 1999.  Sturgeon notes that, even assuming that the statute of limitations was tolled during the time those charges were pending, the limitations period would have expired no later than May 29, 2004.  Because Sturgeon's second trial was held in late March of 2004, Stallings could have requested a two-month continuance for the purpose of securing Bonner's testimony.  (Doc. # 56, at 19-20).

When asked in her deposition, Sturgeon's defense counsel remembered that the prosecutor intended to re-file the dismissed aggravated robbery charges against Bonner if he testified.  (Doc. # 62, *Stallings Deposition*, at 12-14, 22).  Defense counsel could not recall, however, whether she ever conducted any research on the issue of limitations. (*Id.* at 14-15).  The record confirms that defense counsel did not raise an objection based on the issue of limitations or challenge Bonner's decision to invoke his Fifth Amendment rights in any way.

Sturgeon correctly notes that a witness may not invoke the Fifth Amendment privilege against self-incrimination with respect to a criminal offense once the statute of limitations for that offense has expired.  *See Stogner v. California*, 539 U.S. 607, 620 (2003) (noting that "the Fifth Amendment's privilege against self-incrimination does not apply after the relevant limitations period has expired") (citing *Brown v. Walker*, 161 U.S. 591, 597-98 (1896)).  If Sturgeon's counsel had raised this valid objection, Bonner would not have needed to invoke his Fifth Amendment rights and he would have been able to testify on Sturgeon's behalf without fear of prosecution for his role in the aggravated robbery.  Because Bonner would have provided crucial exculpatory testimony, defense counsel's failure to object (or even evaluate options to object) on these grounds caused her performance to fall below an objective level of reasonableness under prevailing professional norms.  *See Strickland*, 466 U.S. at 687-88 (explaining that counsel's performance is deficient where it is not "within the range of competence demanded of attorneys in criminal cases" such that "counsel's representation fell below an objective standard of reasonableness").  Therefore, Sturgeon has

30

established that his counsel's failure to object on the issue of limitations constituted deficient performance for purposes of the first prong of the *Strickland* inquiry.

### b.     The Charges Against Bonner Were Dismissed With Prejudice

In addition, Sturgeon maintains that his counsel was also deficient for failing to raise a different objection on due process grounds.  Sturgeon notes that Bonner need not have invoked his Fifth Amendment rights for fear that aggravated robbery charges would be re-filed by the prosecutor because the previous aggravated robbery indictment against him was dismissed "with prejudice" when Bonner entered his guilty plea on June 29, 1999.  In support, Sturgeon provides an affidavit from Bonner's trial attorney at the time, Donald Catlett, who states that it was always his understanding that the dismissal was "'with prejudice,' or there would have been no value in entering the [plea] agreement."  (Doc. # 56, Exhibit).

In her deposition, the prosecutor in Sturgeon's case (Neelu Sachdeva) agreed that when one charge is dismissed in exchange for a defendant's guilty plea to another charge, that charge is typically dismissed "with the understanding" that the dismissed charge would not be re-filed.  (Doc. # 61, *Sachdeva Deposition*, at 13-14).  She explained that such a dismissal would have been considered "part of the plea bargain."  (*Id.*).

Sturgeon's defense counsel (Ms. Stallings), who was a former prosecutor with the Harris County District Attorney's Office from 1996 through 2001, admitted in her deposition that it would have been a "very unusual situation" for the State to dismiss charges without prejudice pursuant to a plea bargain.  (Doc. # 62, *Stallings Deposition*, at 17-19).  Ms.

Stallings conceded further that she "could have" objected that any attempt to resurrect the aggravated robbery charge against Bonner would have violated due process by breaching the plea agreement.  (*Id.*).  Stallings did not do so.  Because this valid objection would have permitted Bonner to testify on Sturgeon's behalf, her failure to raise this objection was deficient.  *See Strickland*, 466 U.S. at 687-88.

### 3.    Actual Prejudice Resulted

Sturgeon argues that, as a result of his counsel's failure to object when Bonner invoked the privilege against self-incrimination, he was prevented from presenting exculpatory evidence in support of his defense of actual innocence.  As Sturgeon notes, the record reflects that the State's case against him was not particularly strong, resting almost entirely on an identification made by the complaining witness who had been attacked and robbed at gunpoint in the middle of the night following a long day at work.  Apart from the testimony of this one eyewitness, the only other evidence the State presented against Sturgeon at trial was his arrest in the company of Bonner and Tobias, who had Nguy's property in his possession.  Because Bonner's testimony would have provided crucial evidence in support of his defense of actual innocence, Sturgeon has demonstrated a reasonable probability that the result of his proceeding would have been different if his counsel had raised a valid objection and obviated the need for Bonner to invoke his Fifth Amendment rights.  Thus, as a result of defense counsel's failure to raise either one of the above-referenced objections, Sturgeon suffered actual prejudice. *See Richards v. Quarterman*, — F.3d —, 2009 WL 1111177, **6-9 (5th Cir. 2009) (concluding that

counsel's failure to present exculpatory evidence constituted deficient performance and that the defendant was prejudiced as a result).  Because Sturgeon has satisfied both prongs of the *Strickland* test, he has demonstrated a valid claim for ineffective assistance of counsel under the Sixth Amendment, stemming from his attorney's failure to raise a valid objection, and he is entitled to relief on this issue.

### B.    Due Process

As this record demonstrates, Bonner has stated that he wanted to testify on Sturgeon's behalf at his trial in March of 2004, but that he invoked his Fifth Amendment rights because the prosecutor threatened to re-file aggravated robbery charges against him. Sturgeon contends that he is entitled to relief because, as a result of these threats, he was prevented from presenting evidence of his innocence at trial in violation of his constitutional right to due process.

In support of this claim, Sturgeon points to the affidavit filed by Bonner and deposition testimony provided by his defense counsel, as well as the trial court record. Sturgeon's counsel has testified that, even though the aggravated robbery charges against Bonner had been dismissed after his guilty plea in 1999, the prosecutor was threatening to re-file charges against Bonner.  (Doc. # 62, *Stallings Deposition*, at 12-14).  Sturgeon's counsel testified in her deposition that she had "numerous conversations" with the prosecutor, as well as the chief prosecutor from the 182nd District Court (Bill Exley), regarding Bonner and his proposed testimony about Sturgeon's actual innocence. (*Id.*).  She clearly remembered that they intended to "file on [Bonner]" or to re-file the aggravated

robbery charges against Bonner if he admitted his involvement in the offense while testifying on Sturgeon's behalf.  (*Id.*).  Sturgeon's counsel explained that, after Bonner sought her advice about "what he should do," she asked the trial court to appoint an attorney to represent Bonner's interests.  (*Id.*).

The prosecutor admitted having "a discussion about the fact that [Bonner's aggravated robbery] case was not dismissed with prejudice" and that "if he took the stand and testified and said anything incriminating, he could have been filed on."  (Doc. # 61, *Sachdeva Deposition*, at 9-10).  Although the prosecutor denied threatening Bonner in her deposition (*id.* at 19), the record refutes her claim that no threat was made.  As Sturgeon observes, the trial court would not have appointed counsel to represent Bonner as a witness if the prosecutor had not raised the possibility of criminal liability. The trial transcript, which is set forth above, supports Sturgeon's assessment.  The trial record shows that, when asked to confirm whether the aggravated robbery charges against Bonner had been dismissed without prejudice, the prosecutor confirmed that it was her understanding that the charges had been dismissed without prejudice to refiling, meaning that Bonner could have faced aggravated robbery charges if he testified.  (*Court Reporter's Record*, March 24, 2004, vol. 6, at 191). Immediately after this exchange, Bonner invoked the Fifth Amendment privilege against self-incrimination and did not testify on Sturgeon's behalf.  (*See id.* at 192).

Sturgeon correctly notes that it violates due process for a trial judge or a prosecutor to threaten criminal consequences for a potential defense witness who is willing to testify for the defendant at trial without a good-faith, objective basis to support the threat, assuming that

the threat actually intimidates the witness from offering exculpatory testimony.  *See Webb v. Texas*, 409 U.S. 95 (1972) (per curiam).  Sturgeon presents compelling evidence which shows that the prosecutor raised the issue of re-filing charges against Bonner if he gave inculpatory testimony at Sturgeon's second trial in March of 2004, and that Bonner did not testify as a result.  This record supports Sturgeon's claim that Bonner was prevented from providing testimony that was favorable to his defense because he was intimidated by the threat of further prosecution.

In addition, the record also reflects that the threat was without a good-faith, objective basis.  The prosecutor admitted that it was not the usual practice of the Harris County District Attorney's Office to re-file charges once a case had been dismissed pursuant to a guilty plea. (Doc. # 61, *Sachdeva Deposition*, at 14).  She gave no explanation or justification for the dismissal being entered without prejudice contrary to the general rule in Bonner's case.  As discussed previously, the aggravated robbery charges against Bonner had been dismissed following his guilty plea to other related charges brought against him for being a felon in possession of a firearm on December 25, 1998, the same day that the aggravated robbery of Minh Nguy occurred.  Under these circumstances, re-filing the aggravated robbery charges against Bonner likely would have breached the State's plea agreement.  Likewise, re-filing the charges would have violated the statute of limitations.  Because the record confirms that Bonner would have testified on Sturgeon's behalf, but for the threat of additional prosecution, Sturgeon has established a constitutional violation of his right to due process.

35

Pointing to the amended state habeas corpus application that was denied without written order on December 20, 2006, the respondent argues that this claim fails under the deferential AEDPA standard because the Texas Court of Criminal Appeals adjudicated this claim on the merits on state habeas corpus review. *See Ex parte Sturgeon*, No. 65,483-03. For reasons explained previously in this case, this Court disagrees that the AEDPA applies because the state courts did not adjudicate Sturgeon's amended application in compliance with the procedures outlined in Article 11.07 of the Texas Code of Criminal Procedure. (Doc. # 30, *Memorandum and Order*). The Court acknowledges that the Texas Court of Criminal Appeals "denied" Sturgeon's amended state habeas application on December 20, 2006, without a written order. *See Ex parte Sturgeon*, No. 65,483-03. Ordinarily, a denial of relief by the Court of Criminal Appeals is sufficient to serve as adjudication on the merits of the claim. *See Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000); *see also Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999) (noting that, under Texas law, a denial of relief rather than a dismissal of the claim by the Court of Criminal Appeals disposes of the merits of a claim). Adjudication on the merits is a term of art that does not depend on the state court's label. *See Neal v. Puckett*, 286 F.3d 230, 235 (5th Cir. 2002) (explaining that, in the federal habeas corpus context, "adjudication 'on the merits' is a term of art that refers to whether a court's disposition of the case was substantive as opposed to procedural"). In contrast to the Texas case on which the respondent relies, *Ex parte Torres*, 943 S.W.2d 469 (Tex. Crim. App. 1997), it is plain from the record that Sturgeon's amended application was never properly processed by the Harris County Clerk's Office and presented to the trial court

36

for review in accordance with Article 11.07 of the Texas Code of Criminal Procedure.  (Doc. # 30, *Memorandum and Order*, outlining the procedures found in Article 11.07 §§ 3(b)-3(d) of the Texas Code of Criminal Procedure).  Because those procedures were not followed in connection with the amended application filed by Sturgeon, the Court disagrees that the denial of relief issued by the Texas Court of Criminal Appeals on December 20, 2006, qualifies as an adjudication on the merits for purposes of federal habeas corpus review under the unusual circumstances present in this case.

Even assuming that the deferential AEDPA standard applies, however, Sturgeon is still entitled to prevail.  In light of the affidavit provided by Bonner, stating that the prosecutor threatened him with prosecution if he testified on Sturgeon's behalf, and the prosecutor's representation to the trial court on the record, the state court's ultimate decision to reject Sturgeon's claim involves an objectively unreasonable application of the Supreme Court's decision in *Webb v. Texas*, 409 U.S. 95 (1972).  28 U.S.C. § 2254(d)(1).  Accordingly, the Court concludes that Sturgeon is entitled to relief on this issue under either *de novo* or AEDPA review.

### C.      Ineffective-Assistance of Counsel – Failure to Prepare the Expert Witness or to Properly Present Expert Testimony

In addition to the claims concerning Bonner's testimony, Sturgeon complains that his defense counsel was deficient because she failed to present testimony from an expert witness on the issue of eye-witness identification.  The respondent contends that Sturgeon failed to present this exact claim on state habeas corpus review, that it is unexhausted, and procedurally barred.  Sturgeon insists that this claim was raised sufficiently in his state

37

habeas corpus application, but that his claim was not adjudicated on the merits.  For the same reasons set forth above, Sturgeon has demonstrated that his case fits within the fundamental-miscarriage-of-justice exception and he has overcome the alleged procedural default, if any, in this case.  Accordingly, this Court reviews the claim to determine whether Sturgeon has established a constitutional violation of the Sixth Amendment standard for ineffective-assistance claims articulated in *Strickland*.

As outlined in the chronology of Sturgeon's second trial in March of 2004, defense counsel attempted to offer expert testimony from Dr. Steven M. Smith, who has been a professor of psychology at Texas A&M University since 1980.  Smith planned to testify about common misconceptions that lay persons have about eyewitness perception.  At the State's request, the trial court held a *Daubert/Kelly* hearing outside the jury's presence to determine the admissibility of Dr. Smith's proposed testimony.  (*Court Reporter's Record*, vol. 6, March 2004, at 158-234).

The record reflects that Dr. Smith planned to testify about the following issues that were related to the facts of Sturgeon's case: (1) the fact that there is no correlation between an eyewitness's confidence in selecting a perpetrator from a line-up or in court and the accuracy of the identification; (2) the fact that a perpetrator was wearing a hat or hood at the time of the offense (even one not covering his face) could negatively impact the eyewitness's ability to identify the perpetrator later, when he is not wearing a hat or hood; (3) the fact that cross-racial identifications are less accurate than same-race identifications; (4) the fact that the phenomenon of "weapons focus," which occurs when a witness is confronted by a

38

perpetrator who is visibly armed, can reduce the accuracy of an identification; and (5) the fact that an eyewitness who is anxious and excited at the time of the offense typically has worse memory than a person who was not anxious or excited at the time of the viewing. (*Id.* at 159, 167, 182-86). Dr. Smith, however, did not come to court with copies of the studies that he relied upon for his opinions and, as a result, he was unable to provide information that the prosecutor requested on cross-examination about the reliability of his proposed testimony. (*Id.* at 198-99, 215-17, 230-31). Likewise, Dr. Smith conceded that he had not interviewed the complaining witness and that he had not reviewed the police reports or any other documents about the offense. (*Id.* at 202-03). Thus, he was unable to provide a specific opinion about the facts of Sturgeon's case. (*Id.*).

At the conclusion of the *Daubert/Kelly* hearing, the presiding judge excluded Dr. Smith's testimony. (*Id.* at 232-34). The trial court found that Dr. Smith's testimony was not reliable because he could not name the authors or specific titles of the various studies on which he relied. (*Id.* at 233). The trial court also accepted the prosecutor's contention that those studies were "staged" for academic purposes as opposed to studies involving real "crime victims." (*Id.*). In addition, the trial court criticized Dr. Smith's proposed testimony on the ground that he did not have an accurate understanding of the facts of Sturgeon's case, noting that there needed to be a "fit" between the expert opinion and the precise facts. (*Id.* at 233-34).

Sturgeon complains that his counsel was deficient in her preparation of Dr. Smith as an expert witness and in her presentation of his testimony. In particular, Sturgeon claims that

his attorney did not prepare Dr. Smith for cross-examination by the prosecutor about the authors of the studies on which he relied and should have advised him to come prepared with this information. Likewise, defense counsel did not prepare Dr. Smith for cross-examination about the facts of the case or by providing him with materials pertinent to the case, such as the police reports and the transcript of Sturgeon's first trial, which information was readily available. Sturgeon argues that, in light of the well-known legal standard for admitting expert testimony, his counsel's performance was clearly deficient. As a result of her deficient performance, Dr. Smith's testimony was excluded and Sturgeon was denied the opportunity to present evidence regarding the reliability of the identification made by the State's sole eyewitness.

The current legal standard governing the admission of scientific expert testimony has been in place since the Supreme Court decided *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In an effort to prevent jurors from hearing expert opinions based on untested theories or invalid methods (*i.e.*, junk science), the Supreme Court held that, before a party can present expert testimony based on "scientific knowledge," the proponent must demonstrate to the trial court, in its capacity as a "gatekeeper," that the proposed expert testimony is based on "good" science and, therefore, sufficiently reliable. *Daubert*, 509 U.S. at 595-99; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (explaining that the objective of *Daubert's* gatekeeping requirement is "to ensure the reliability and relevancy of expert testimony" and to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field"); *General Elec. Co. v. Joiner*, 522 U.S. 136, 153-54 & n.6 (1997) (Stevens, J., concurring) (observing that *Daubert* concerned the admissibility of valid scientific evidence and the exclusion of "junk science").  The proponent must also show that the proffered expert testimony is relevant because it is "'sufficiently tied to the facts of the case such that it will aid the jury in resolving a factual dispute.'"  *Daubert*, 509 U.S. at 591 (quotation omitted).

As outlined in *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992), Texas courts follow an evidentiary standard that is nearly identical to the one in *Daubert*.  Admission of scientific evidence is governed by Rule 702 of the Texas Rules of Evidence, which provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

TEX. R. EVID. 702.[10]  Under Rule 702, the proponent of scientific evidence must show, by

"clear and convincing" proof and outside the presence of the jury, that the proffered evidence

is sufficiently relevant and reliable to assist the jury in accurately understanding other

evidence or in determining a fact issue.  *See Kelly*, 824 S.W.2d at 572-73.  The reliability of

"soft" science evidence, such as the reliability of eyewitness identifications, may be

established by showing that (1) the field of expertise involved is a legitimate one, (2) the

subject matter of the expert's testimony is within the scope of that field, and (3) the expert's

testimony properly relies upon or utilizes the principles involved in that field.[11]  *Weatherred*

---

[10]     This rule was copied from Rule 702 of the Federal Rules of Evidence ("Federal Rule 702")
and went into effect on March 1, 1998.  *See* STEVEN GOODE, OLIN GUY WELLBORNE III, &
M. MICHAEL SHARLOT, TEXAS PRACTICE SERIES, GUIDE TO THE TEXAS RULES OF EVIDENCE
§ 702.3, at 31 (2002) (noting that Federal Rule 702 is the source for Texas Rule 702).  Since
that time, Federal Rule 702 has been amended to clarify its meaning.  Federal Rule 702 now
provides as follows with regard to the admissibility of expert testimony on technical or
scientific matters:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue,
> a witness qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form of an opinion
> or otherwise, if (1) the testimony is based upon sufficient facts or
> data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods
> reliably to the facts of the case.

FED. R. EVID. 702.

[11]     In determining the reliability of the testimony, the Supreme Court in *Daubert* identified four
factors that it considered key, including: (1) whether the theory or technique can be or has
been tested, (2) whether the theory or technique has been subjected to peer review or
publication, (3) the known or potential rate of error, and (4) general acceptance within the
relevant scientific community.  *Daubert*, 509 U.S. at 593-95.  As the Supreme Court has
explained, however, these factors are flexible and a trial court has broad latitude in deciding
how to test an expert's reliability depending on whether *Daubert's* factors are, or are not,
(continued...)

*v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000) (citation omitted).  Likewise, for a

scientific theory to be considered relevant, a proponent must satisfy the following criteria

before the proposed evidence may be admitted in any particular case: (a) the underlying

scientific theory must be valid; (b) the technique applying the theory must be valid; and (c)

the technique must have been properly applied on the occasion in question.  *Kelly*, 824

S.W.2d at 573.  With respect to relevance, the proposed evidence must assist the jury with

a fact in issue and must be "sufficiently tied to the facts of the case" such that it will "aid the

jury in resolving a factual dispute."  *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App.

1996) (quoting *Daubert*, 509 U.S. at 591-93)).    Expert testimony about common problems

related to eyewitness identification is — and has long been — admissible in Texas under the

*Daubert/Kelly* standard.  *See Jordan*, 928 S.W.2d 550 (Tex. Crim. App. 1996).  Texas courts

have recognized that this evidence is particularly important when the challenged eyewitness

testimony is critical to the prosecution's case:

> Courts from all levels, psychologists, and commentators have accepted the
> premise that the "identification of strangers is proverbially untrustworthy."
> *United States v. Wade*, 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d
> 1149 (1967); *U.S. v. Brownlee*, 454 F.3d 131, 141 (3rd Cir. 2006); *Cook v.
> State*, 741 S.W.2d 928, 952 (Tex. Crim. App.1987) (Clinton J., dissenting).

---

[11](...continued)
> reasonable measures of reliability in a particular case.  *See Kumho*, 526 U.S. at 152-53.  In
> addition to the standard factors of reliability listed in *Kelly*, the Texas Court of Criminal
> Appeals has also identified a "nonexclusive list of factors that could influence a trial court's
> determination of reliability," including "(1) the extent to which the theory and procedure are
> accepted as valid by the relevant scientific community; (2) the technique's potential rate of
> error; (3) the availability of experts to test and assess the method or technique; (4) the clarity
> and precision with which the underlying scientific premise and approach can be explained
> to the court; and (5) the knowledge and experience of the person(s) who applied the
> methodology on the occasion in question."  *Kelly*, 824 S.W.2d at 573.

> The hazards of eyewitness identifications are established by a formidable number of instances of misidentification in the records of American criminal jurisprudence. . . . Making the situation even more problematic is the fact that "jurors seldom enter a courtroom with the knowledge that eyewitness identifications are unreliable." . . . Given these vagaries, a defendant's ability to effectively challenge the certainty and confidence of an eyewitness identification is a matter of paramount importance to the fair administration of justice.

*Stephenson v. State*, 226 S.W.3d 622, 628 (Tex. App. — Amarillo 2007, no pet.) (footnotes omitted).  Nevertheless, this type of expert testimony is not automatically admitted if the proponent does not meet his burden to show that the evidence is both reliable and relevant. *See Weatherred*, 15 S.W.3d at 542-43 (holding that the trial court did not abuse its discretion by refusing to admit expert testimony on the reliability of eyewitness identification where the defendant did not meet his burden to demonstrate reliability).

Sturgeon complains that, in view of the well establish legal standard, his defense attorney should have been well aware of the requirements for presenting expert testimony on the issue of eyewitness identifications.  In support of his ineffective-assistance claim, Sturgeon provides an affidavit from Dr. Smith, who contends that Sturgeon's counsel made no effort to prepare him to comply with the *Daubert/Kelly* requirements.  (Doc. # 56, Affidavit). Dr. Smith confirms that Sturgeon's counsel did not provide him with police reports or transcripts from the first trial in which the eyewitness previously testified.  (*Id.*). Had these materials been provided, and had counsel requested, Dr. Smith would have reviewed the materials before his testimony.  (*Id.*).  Dr. Smith also confirms that Sturgeon's counsel did not instruct him to bring copies of the scientific studies that he relied upon in giving his expert witness opinion.  (*Id.*).  Dr. Smith, who reports that he has been qualified

as an expert witness on identification in approximately twenty cases since 1990, states that he has provided copies of these scientific studies in other trials where he has testified and that he would have done so in Sturgeon's case if he had been asked by defense counsel.  (*Id.*).

The hiring of expert witnesses and the presentation of their testimony is typically considered a matter of trial strategy. *See Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993). Sturgeon's defense counsel, however, has offered no explanation for her failure to prepare Dr. Smith in material ways for his testimony in this instance by requesting that he bring copies of the relevant scientific studies for the trial court's consideration during the *Daubert/Kelly* hearing.  Likewise, she offers no explanation for her failure to provide Dr. Smith with available documents and records from the first trial to familiarize him with the specific facts of Sturgeon's case.

The Court notes that Dr. Smith's credentials are extensive and that he has been qualified to testify as an expert on eyewitness identification in other trials.  The State's case against Sturgeon rested almost entirely on the testimony of the complaining witness. Notably, the complaining witness provided what is known as a cross-racial identification. The problems of cross-racial identification are well known and these issues have been the subject of significant scholarly research.  *See, e.g.*, John P. Rutledge, *They All Look Alike: The Inaccuracy of Cross-Racial Identifications*, 28 AM. J. CRIM. L. 207 (2001) Sheri Lynn Johnson, *Cross-Racial Identification Errors in Criminal Cases*, 69 CORNELL L. REV. 934 (1984); *see also Nelson v. State*, 914 S.W.2d 670, 671-72 (Tex. App. — Texarkana 1996, no pet.) (Grant, J., concurring) (discussing cross-racial identification and noting that the

45

existence of the phenomenon that is generally referred to as the "own-race effect" is "universally accepted") (citations omitted).  A recent study of exonerated inmates has shown that eyewitness misidentifications, particularly those involving cross-racial identifications, have resulted in a large number of wrongful convictions.  *See* Brandon L. Barrett, *Judging Innocence*, 108 COLUM. L. REV. 55, 79-80 (2008) (reporting that, in a recent study involving 200 death row inmates exonerated by the Innocence Project, "48% of exonerees convicted based on eyewitness testimony were identified cross-racially"); *see also* Radha Natarajan, Note, *Racialized Memory and Reliability: Due Process as Applied to Cross-Racial Identifications*, 78 N.Y.U. L. REV. 1821, 1822 (2003) (observing that, based on evidence compiled by the Innocence Project, "cross-racial identifications are one of the leading causes of erroneous convictions").  Because the State's case against Sturgeon consisted mainly of his cross-racial identification by the complainant, who was the only eyewitness to the offense, counsel's failure to prepare Dr. Smith for trial cannot be considered reasonable trial strategy and was not adequate.  *See, e.g., Draughon v. Dretke*, 427 F.3d 286, 296-97 (5th Cir. 2005) (concluding that counsel's failure to obtain an expert was deficient and that the state court's decision to the contrary was an unreasonable application of *Strickland*).

In light of the above-referenced evidence in support of Sturgeon's claim of actual innocence, defense counsel's failure to prepare Dr. Smith to testify about the unreliability of eyewitness identifications prevented Sturgeon from presenting testimony that would have called into question the only direct evidence against him.  Because Dr. Smith's testimony would have provided important support for his defense of mistaken identification, Sturgeon

has demonstrated a reasonable probability that the result of his proceeding would have been different if his counsel had performed in an objectively reasonable manner. Thus, as a result of Ms. Stallings's deficient performance, Sturgeon suffered actual prejudice because he was prevented from presenting Dr. Smith's testimony before the jury. Accordingly, the Court concludes that Sturgeon has demonstrated a constitutional violation of the right to effective assistance of counsel on this issue. Assuming that the deferential AEDPA standard applies, the Court concludes that the state court's decision to reject this claim constitutes an objectively unreasonable application of the *Strickland* standard and that Sturgeon is entitled to relief on this issue.

### D. Due Process — Pretrial Identification

In his final claim, Sturgeon contends that the trial court erred by admitting evidence of his pretrial identification by the complaining witness because the police employed unduly suggestive procedures. The Due Process Clause prohibits identification testimony at trial that derives from impermissibly suggestive procedures, which may lead in turn to an irreparably mistaken identification. *See Stovall v Denno*, 388 U.S. 293, 302 (1967). For example, a conviction based on an eyewitness identification at trial following a pretrial photographic identification may be set aside "if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). "A two-step process governs the admissibility of identification evidence: First, a court must determine whether the pretrial identification was impermissibly suggestive; if it was, then second, a court must

47

determine whether, 'under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification.'" *Coleman v. Quarterman*, 456 F.3d 537, 544 (5th Cir. 2006) (quoting *Herrera v. Collins*, 904 F.2d 944, 946 (5th Cir. 1990)), *cert. denied*, 549 U.S. 1343 (2007).

The State presented evidence that the complaining witness identified Sturgeon prior to trial from a line-up procedure that was conducted in person at the HPD Central Jail by Officer Craig Scallan.  When he reported the robbery to police, the victim identified his assailant as an African-American male who had a noticeable goatee.  A review of the line-up shows that it contains six African-American males and one light-skinned Hispanic male (Tobias).[12]  Of the African American men in the line-up, Sturgeon is the only male who had a noticeable goatee.  Bonner, who was also in the line-up, had only a faint goatee.  No other African American man in the line-up had facial hair of the type described by the complaining witness.  Because he was the sole participant in this line-up to have a noticeable goatee, Sturgeon's appearance was emphasized in a way that rendered the procedure unduly suggestive. *See Simmons*, 390 U.S. at 383 (holding that a line-up procedure is impermissibly suggestive if one individual in the group is "in some way emphasized").

Adding to the suggestive nature of the pretrial line-up proceeding, the trial record shows that, prior to viewing the line-up, the complaining witness was told that it contained three individuals who had been arrested and who were suspected of committing the robbery. (*Court Reporter's Record*, June 1999, vol. 3, at 44; vol. 5, at 95-96, 109).  At Sturgeon's

---

[12]    A copy of the video line-up is in the record.

second trial, the complaining witness admitted that, prior to viewing the line-up, he was told that the police had arrested people who were found in possession of his property.  (*Court Reporter's Record*, March 2004, vol. 3, at 55-56).  The information provided to the witness, in combination with the fact that Sturgeon was the only African-American man in the line-up with a noticeable goatee, is another factor that rendered the line-up procedure impermissibly suggestive.

The respondent argues that, even assuming that the pretrial identification was unduly suggestive, the totality of circumstances do not reflect that Sturgeon was misidentified.  In *Neil v. Biggers*, 409 U.S. 188 (1972), the Supreme Court applied a five-factor test to determine whether an identification is reliable notwithstanding a suggestive pretrial line-up procedure: (1) the opportunity of the witness to view the perpetrator at the time of the offense; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *See Livingston v. Johnson*, 107 F.3d 297, 310 (5th Cir. 1997) (listing the factors outlined in *Biggers*, 409 U.S. at 199-200).  These factors are discussed briefly below.

The fourth and fifth factor favor the government in this instance.  The victim testified that he was very "certain" he had identified the man who robbed him at gunpoint.  Likewise, the length of time between the incident on December 25, 1998, and the identification on December 26, 1998, was brief.  The other factors, however, do not support a firm conclusion that the identification was sufficiently reliable.

49

With regard to the first two factors, the record reflects that the complaining witness had only a short time to view his assailant before a gun was pointed at him. As outlined at trial, the witness testified that he was approached by two strangers, he was pulled from his car, and struck repeatedly in the eyes before being pushed to the ground face first. Specifically, the victim recounted that he was repeatedly hit with a pistol in both eyes. As a result, he suffered a bloody gash over his left eye. Nguy's injuries were such that, when he appeared at the line-up proceeding on December 26, 1998, his face and the area around both eyes was swollen. In addition, the robbery happened after midnight on Christmas Eve, after the victim had returned home from working a lengthy shift as a cook at his family's restaurant. Although there was a security light on at his home, the victim conceded that it was dark, that he was tired from a long day at work, and that he was very frightened by his assailant's firearm. Any one of these factors could have precluded the victim from making an accurate identification. In that respect, in response to defense counsel's questioning, Officer Scallan acknowledged that Nguy's ability to identify the robbers was difficult because the lighting at the scene of the crime was "not great enough for [Nguy] to see their features" and because Nguy "was being struck in the face and so he couldn't really see them."

Regarding the third factor, the accuracy of the victim's initial identification was far from exact or certain. The victim testified that he was accosted by two black men — one short and one tall. The victim stated that the tall robber was the one who assaulted him by striking him in the face with a pistol. The victim estimated that the primary assailant was at

50

least six-feet tall.  Sturgeon, however, is several inches shorter than that, standing at only five-feet-eight-inches tall.  The victim also testified that his assailant had a goatee and that he wore a hat or a hood, but he could not tell which.  He made no mention of Sturgeon's full mustache.  The victim conceded that he did not get a good look at the second robber.

As outlined above, the line-up procedure used to obtain Sturgeon's identification prior to the trial was suggestive.  The Supreme Court has stated that the corrupting effect of the suggestive identification is a consideration when weighing the totality of the circumstances. *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977).  Apart from his identification, there is no other direct evidence connecting Sturgeon to the offense.  Considering the totality of the circumstances, this Court cannot say that there was no reasonable likelihood of a mistaken identification in Sturgeon's case.  Assuming that the AEDPA applies in this instance, as the respondent insists, the state court's decision to deny relief on this claim was an objectively unreasonable application of clearly established Supreme Court precedent.  Accordingly, the Court concludes that Sturgeon is entitled to relief on this issue as well.

## IV.    CONCLUSION AND ORDER

Sturgeon has shown that he is entitled to relief and the respondent has not presented facts or law to the contrary.  Accordingly, the Court grants Sturgeon's amended petition for a writ of habeas corpus and denies the respondent's motion for summary judgment.

Based on the foregoing, the Court **ORDERS** as follows:

1.    The respondent's motion for summary judgment (Doc. # 59) is **DENIED.**

2.    The petitioner's Amended Petition for a Writ of Habeas Corpus (Doc. # 56) is **GRANTED**.

51

3.     The petitioner's request for an evidentiary hearing (Doc. # 63) is **DENIED** as **MOOT**.

4.     The respondent is **ORDERED** to release Petitioner Richard Glen Sturgeon from custody unless the State of Texas initiates new criminal proceedings against him within 120 days of the date of this order.

The Clerk will provide copies of this order to the parties.

SIGNED at Houston, Texas, on May 12th, 2009.

Nancy F. Atlas
United States District Judge